1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-Filed: 02-18.10

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DAVID HENRY, an individual; MEAGEN HENRY, an individual; DAVID KANE HENRY and MEAGAN R. THOMAS FAMILY LIVING TRUST, a California living trust, | ) CASE NO. CV 08-06625 MMM (AJWx) ) ) ) ) |
| Plaintiff, | ) FINDINGS OF FACT AND ) CONCLUSIONS OF LAW ) |
| vs. | ) ) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, in its own name and as Receiver for IndyMac Bank, F.S.B.; DOES 1 through 10, | ) ) ) ) ) |
| Defendants. | ) ) |

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A). That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it. The FDIC made deposit insurance determinations for accounts held at IndyMac and notified depositors of the determinations via letter. Some depositors, including plaintiffs, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

The parties filed opening briefs on July 13, 2009,[1] and responding briefs on July 27, 2009.[2] On July 31, 2009, the court granted plaintiffs' request for oral argument and set a hearing for October 19, 2009.

## I.  FINDINGS OF FACT

### A.    The Accounts

1.    Plaintiffs David Henry, Meagan Henry, and the David Kane Henry and Meagan R. Thomas Living Trust ("Trust") had five accounts with IndyMac prior to July 11, 2008.[3]

2.    Prior to July 11, 2008, account XXXXXX4758 had a balance of $109,560.69, account XXXXXX4767 had a balance of $109.747.71, account XXXXXX0486 had a balance of $404,165.09, account XXXXXX8793 had a balance of $11,250.55, and account XXXXXX4185 had a balance of $100.00.[4]  The funds deposited in the five accounts belonging to the Trust thus totalled $634,824.04.[5]

---

[1]Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Trust's Opening Brief ("Henrys' Brief"), Docket No. 24 (July 13, 2009); Defendant Federal Deposit Insurance Corporation's Opening Trial Brief ("FDIC's Brief"), Docket No. 2, (July 13, 2009).  Prior to this date, plaintiffs advised the court that they did not seek discovery beyond the administrative record produced by the FDIC.  (Notice re: Request for Additional Discovery and/or Objections to Contents of Administrative Record, Docket No. 22 (June 8, 2009).)  That is the record, therefore, to which the court looks in deciding the action.

[2]Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Trust's Reply Brief; Request for Oral Argument ("Henrys' Reply"), Docket No. 27 (July 27, 2009); Defendant Federal Deposit Insurance Corporation's Response Trial Brief ("FDIC's Reply"), Docket No. 26 (July 27, 2009).

[3]Declaration of Melissa Howard Attaching Administrative Record ("Howard Decl."), Docket No. 18 (Apr. 13, 2009), ¶ 2; Exh. A (Administrative Record ("AR")) at 2.

[4]Howard Decl., ¶ 2; AR, Exh. A at 2.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (Howard Decl., ¶ 2 n. 1.)

[5]Howard Decl., ¶ 2; AR, Exh. A at 2.

3.   All five accounts were revocable trust accounts held in the name of the Trust.[6]

4.   Meagan Henry and David Henry deposited funds to the accounts,[7] and were the only trustees of the Trust.[8]

5.   The Trust had eight beneficiaries: William Henry, Steven Henry, and Michael Henry, identified as brothers of David Henry; Sarah Fareli, Bridget Meckli, and Aaron Thomas, identified as sisters of Meagan Henry; Rachel Cronin, identified as the sister of both Meagan and David Henry; and John Wall, identified as a friend of Meagan and David Henry.[9]

**B.   The FDIC's Insurance Determination**

6.   The FDIC as receiver for IndyMac assigned Melissa Howard to review deposit insurance coverage and claims arising out of IndyMac's failure.  Howard reviewed the five accounts at issue in this case.[10]

7.   On August 8, 2008, Howard interviewed both depositors and explained her preliminary determination regarding the amount of insured and uninsured funds in the accounts.  The Henrys provided no further material information, but asserted that, at the time they opened the accounts, IndyMac had assured them the accounts would be fully insured.  The Henrys also stated that they felt the FDIC's informational material did not clearly explain the regulations governing the insuring of revocable trust accounts.[11]

8.   On August 8, 2008, Howard concluded that under the deposit insurance rules then in effect, the Trust had sixteen "beneficial relationships," defined as a relationship between

---

[6]AR, Exh. A at 2; Howard Decl., ¶ 2; Henrys' Brief at 2.

[7]AR, Exh. B ("Depositor Interview Form").

[8]AR, Exh. C ("Declaration for Trust").

[9]*Id.*; Howard Decl., ¶ 5 & n. 2.

[10]Howard Decl., ¶ 1.

[11]AR, Exh. B ("Depositor Interview Form").

one trustee and one beneficiary.   Howard also concluded that only seven beneficial relationships involved qualifying beneficiaries (brothers and sisters), and that the remaining nine involved non-qualifying beneficiaries (brothers-in-law, sisters-in-law, and a friend). Howard concluded that the seven qualifying beneficiaries were insured and that the nine non-qualifying beneficiaries were uninsured.  She therefore found that the seven qualifying beneficiaries were insured for a one-sixteenth share of the funds,[12] or $277,735.52.[13]

9.      Howard determined that the remaining funds, which belonged to the nine non-qualifying beneficiaries, reverted to the single ownership of the two depositors, Meagan and David Henry.  As single owners, they were insured for an additional $100,000 per depositor.[14]

10.    Howard thus concluded that the total amount insured was $477,735.52 and that the total amount uninsured was $157,088.52.[15]

11.    On August 9, 2009, the FDIC sent Meagan and David Henry a Notice of Allowance of Claim ("Notice") and a Receivership Certificate in the amount of $157,088.54.[16]

12.    Based on the FDIC's calculation that the ultimate resolution of IndyMac's assets would result in a recovery of approximately 50% of the uninsured deposits of IndyMac, FDIC sent the Henrys a 50% advance dividend of $78,544.27.

## II.  CONCLUSIONS OF LAW

### A.      Standard of Review

13.    The FDIC's determination of insurance coverage is governed by the Federal Deposit Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

---

[12]Howard Decl., ¶ 5.  A one-sixteenth share of $634,824.04 is $39,676.50.

[13]*Id.* 5. $39,676.50 * 7 = $277,735.52.

[14]*Id.*

[15]*Id.* $634,824.04 - $277,735.52 = $157,088.52.

[16]*Id.*, ¶ 6.  AR, Exh. D at 1-2.

14.    The FDIC's final determination "regarding any claim for insurance coverage [is] a final agency action reviewable in accordance with" the Administrative Procedure Act ("APA"). 12 U.S.C. § 1821(f)(4).  Under the APA, the court examines whether the FDIC's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).   Accordingly, the parties agree that the relevant question the court must answer is whether the FDIC's action was arbitrary or capricious.[17]

15.    Final agency decision is arbitrary and capricious if the agency "'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *O'Keeffe's Inc. v. U.S. Consumer Product Safety Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

16.    A district court is limited to a review of the reasoning on which the agency relied in making its decision.  *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  It can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43.  Where an agency offers an "interpretation of its own regulation [that] reflects its considered views," even if those views  are developed in response to litigation and communicated in a legal brief, the court should accept the interpretation if convinced it is not "merely a *post hoc* rationalization."  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007). See also *Alaska v. Federal Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir. 2008) ("While we may not fabricate a rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" quoting *Motor Vehicles*

---

[17]Henrys' Brief at 3-4; FDIC's Brief at 3.

*Manufacturers' Association*, 463 U.S. at 43).  "'Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Northwest Coalition for Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544 F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43).

17.  "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted.'"  *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir. 2009) (quoting *Long Island Care at Home*, 551 U.S. at 171).  See also *Long Island Care at Home*, 551 U.S. at 170-71 ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation alone presents no separate ground for disregarding the Department's present interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir. 2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)).  "In other words, we must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'"  *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).  See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1131 (9th Cir. 2003) ("When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission*, 499 U.S. 144, 150-51 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries Service*, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the

regulation").

**B.      Whether the FDIC Properly Determined the Amount of Deposit Insurance to Which Plaintiffs Were Entitled under the Regulations Applicable on August 8, 2008**

18.      The FDIC's deposit insurance determinations are governed the regulations set forth in 12 C.F.R. Part 330.   Regulations governing recognition of deposit ownership and fiduciary relationships note that, except in circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1).[18] See also *Villafane-Neriz v. F.D.I.C.*, 75 F.3d 727, 731 (1st Cir. 1996) (holding that the FDIC "is entitled to rely exclusively on the account records of the failed institution," and that "while ownership under state law is one prerequisite for insurance coverage, the deposit account records are controlling").   "Deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the

---

[18]The regulation continues:
"If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be considered binding on the depositor, and the FDIC shall consider no other records on the manner in which the funds are owned.  If the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned.  Despite the general requirements of this paragraph (a)(1), if the FDIC has reason to believe that the insured depository institution's deposit account records misrepresent the actual ownership of deposited funds and such misrepresentation would increase deposit insurance coverage, the FDIC may consider all available evidence and pay claims for insured deposits on the basis of the actual rather than the misrepresented ownership." 12 C.F.R. § 330.5(a)(1).

1    insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).[19]   As

2    noted, plaintiffs did not seek leave to conduct further discovery, and do not object to the

3    contents of the administrative record.[20]

4    19.   At the time IndyMac closed, revocable trust accounts were insured up to $100,000 per

5    owner if certain conditions were met.  First, the title of the account had to reflect that the

6    funds were held pursuant to a formal revocable trust set up by an owner or grantor.  The

7    owner or grantor was required to retain ownership during his or her life.  12 C.F.R.

8    § 330.10(f)(1), (4) (2008), 69 Fed. Reg. 2829-30 (Jan. 21, 2004) (stating that "revocable

9    trust accounts held in connection with a formal revocable trust created by an owner/grantor

10   and over which the owner/grantor retains ownership during his or her lifetime," qualify

11   for coverage if "the title of the account . . . reflect[s] that the funds in the account are held

12   pursuant to a formal revocable trust").  Second, while the beneficiaries need not be

13   identified by name in the deposit account records, they must be "qualifying" beneficiaries.

14   The "owner's spouse, child/children, grandchild/grandchildren, parent/parents,

15   brother/brothers or sister/sisters" are "qualifying beneficiaries." 12 C.F.R. § 330.10(a)

16   (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999).[21]

17   20.   When a revocable trust account was established by more than one owner and held for the

18   benefit of others, some or all of whom were qualifying beneficiaries, the regulation

19   provided that the respective interests of each owner held for the benefit of each qualifying

20   beneficiary would be separately insured up to $100,000.  12 C.F.R. § 330.10(d) (2008),

21

22   [19]The term excludes "account statements, deposit slips, items deposited or cancelled
23   checks."  12 C.F.R. § 330.1(e).

24   [20]Notice re: Request for Additional Discovery and/or Objections to Contents of
25   Administrative Record, Docket No. 22 (June 8, 2008).

26   [21]Under the regulations in effect when IndyMac closed and the FDIC made the insurance
     determination challenged in this action, there was "no requirement . . . that the deposit account[ ]
27   records of the depository institution indicate the names of the beneficiaries of the living trust and
     their ownership interests in the trust."  12 C.F.R. 330.10(f)(1), (4) (2008) 69 Fed. Reg. 2830
28   (Jan. 21, 2004).

63 Fed. Reg. 25760-61 (May 11, 1998).   The owners were presumed to have equal interests in the account unless otherwise stated in the deposit account records.   *Id.*

21.   While the trust owner was the insured party, insurance coverage was provided for the interest of each qualifying beneficiary up to $100,000.   12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999); 12 C.F.R. § 330.10(f)(1) (2008), 69 Fed. Reg. 2829 (Jan. 21, 2004). If a named beneficiary of a revocable trust account was not a qualifying beneficiary, the funds held for the benefit of that beneficiary were treated as individually owned by the grantor.   12 C.F.R. § 330.10(c) (2008), 63 Fed. Reg. 25760 (May 11, 1998).

22.   Stated differently, the FDIC insured each grantor up to $100,000 for the interest of each qualifying beneficiary.   If each grantor held an amount for the benefit of the same qualifying beneficiary, those amounts were separately insured.   12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760-61 (May 11, 1998); Advisory Opinion FDIC-05-05, Question Regarding Deposit Insurance for a "Spousal Revocable Living Trust," 2005 WL 2979649, *1-2 (Sept. 12, 2005) ("Under this rule, the FDIC would assume . . . that the two grantors . . . have contributed equal amounts. . . .   The amount contributed by each grantor for each 'qualifying beneficiary' would be insured separately").   In making its insurance determination, therefore, the FDIC assumes that, unless otherwise stated, each grantor has contributed 50% of the funds in the account.   Advisory Opinion FDIC-05-05, 2005 WL 2979649 at *2 ("[Where B and C are two grantors], with an account balance of $550,000, the FDIC would assume that B has contributed $275,000 and that C has contributed $275,000. The funds contributed by B would be insured separately from the funds contributed by C").   It then analyzes insurance coverage as if the revocable trust account were two accounts, each holding 50% of the funds, and there were separate trustee-beneficiary relationships between each grantor and each beneficiary.   *Id.* at *2-4.   As a result, in a situation where there are two grantors and a single qualifying beneficiary, insurance coverage of $200,000 is available.   *Id.* (describing a hypothetical in which a daughter is a qualifying beneficiary of both grantors, and each grantor is therefore insured

to $100,000).  Conversely, where a person is a qualifying beneficiary of one grantor, but a non-qualifying beneficiary of the second, only the qualifying relationship is insured.[22]

23.  In this case, there are two grantors and eight beneficiaries.  Howard thus determined that there were sixteen beneficial relationships, each of which held a one-sixteenth share of the amount deposited.  Of the sixteen beneficial relationships, seven were qualifying sibling relationships, while nine were non-qualifying sister-in-law, brother-in-law, and friend relationships.[23]  The FDIC presumed that the grantors held an equal one-sixteenth share for the benefit of each beneficiary, or $39,676.50.  Because seven shares were insured under § 330.10, the FDIC determined that the Henrys were entitled to receive $277,735.52 in insurance for the revocable trust account.

24.  The funds held for the benefit of non-qualifying beneficiaries were treated as owned by the two grantors.  The FDIC thus determined that each of Meagan and David Henry was entitled to receive additional $100,000 in insurance coverage.

25.  The FDIC's final deposit determination regarding plaintiffs' accounts was in accordance with the law and supported by the evidence upon which FDIC was required to rely.  Although plaintiffs dispute whether the regulation in effect at the time the deposit insurance determination was made applies, and also contend that the regulation was "too vague and complex to understand or apply," they do not dispute that the FDIC correctly applied the regulation to their accounts.[24]

C.   **Whether the Prior Regulation Was Arbitrary or Capricious**

26.  Plaintiffs do not explicitly challenge the prior regulation's validity.  Rather, they assert that

---

[22]While this advisory opinion does not appear in the Federal Register, it does represent an authoritative opinion of the FDIC regarding the interpretation of its own rules.  *Public Citizen*, 573 F.3d at 923 (quoting *Long Island Care at Home*, 551 U.S. at 171) ("[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted'").

[23]Howard Decl., ¶ 5.

[24]Henrys' Reply at 3-4.

it was "too ambiguous and complex for the public to understand," and that it was so "flawed" that the FDIC took the unusual step of implementing an interim rule before the notice and comment period.[25]  Despite plaintiffs' criticisms, the court concludes that the regulation was not an arbitrary or capricious interpretation of the governing statute.

27.  Courts give broad deference to an agency interpretation so long as it meets the test set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  First, if the court determines that "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).  "Second, if a statute is silent or ambiguous with respect to the issue at hand, we must defer to the agency so long as the agency's answer is based on a permissible construction of the statute.'"  *Satterfield*, 569 F.3d at 952 (quoting *Chevron*, 467 U.S. at 843).  "An agency's interpretation is permissible, unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Id.* (quoting *Chevron*, 467 U.S. at 844).

28.  While *Chevron* concerned formal notice-and-comment rulemaking by an agency, the Supreme Court clarified in *United States v. Mead Corp.*, 533 U.S. 218 (2001), that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051, 1060 (9th Cir. 2003) (quoting *Mead*, 533 U.S. at 226-27).  "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."  *Mead,* 533 U.S. at 227.  "Those administrative decisions not meeting these standards may still be given deference under

---

[25]*Id.* at 2-3.

1    *Skidmore v. Swift & Co.*, 323 U.S. 134 [ ] (1944)." *Satterfield*, 569 F.3d at 952-53.

2    29.   Applying this test, "[t]he first step under the *Chevron* analysis is to determine 'whether

3          Congress has directly spoken to the precise question at issue.'" *Satterfield*, 569 F.3d at 953

4          (quoting *Chevron*, 467 U.S. at 842).   "If a court, employing traditional tools of statutory

5          construction, ascertains that Congress had an intention on the precise question at issue, that

6          intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n. 9.   "It is well

7          settled that the starting point for interpreting a statute is the language of the statute itself. "

8          *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 56 (1987)

9          (internal citation and quotation marks omitted).   "[U]nless otherwise defined, words will

10         be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v.*

11         *United States*, 444 U.S. 37, 42 (1979).

12   30.   Congress has delegated to the FDIC the authority to make rules and regulations to

13         implement the FDIA.   See 12 U.S.C. § 1821(d)(1).   Section 1821(a) provides that deposits

14         maintained by a depositor in the same capacity and the same right at an insured depository

15         institution must be aggregated and insured up to the standard maximum deposit insurance

16         amount ("SMDIA").   The Act does not define "depositor," "capacity," or "right."   See

17         63 Fed. Reg. 25750 (May 11, 1998).   Although § 1817(i)(1) provides a special rule for

18         insurance of *ir*revocable trust accounts, no section of the act specifically addresses

19         insurance of revocable trust accounts.   Section 1821(a)(1)(C) requires that the FDIC

20         "aggregate the amounts of all deposits in the insured depository institution which are

21         maintained by a depositor in the same capacity and the same right for the benefit of the

22         depositor either in the name of the depositor or in the name of any other person."   The

23         statute does not provide any further definition or guidance regarding the insurance to be

24         provided for revocable trust accounts that have multiple grantors and beneficiaries such as

25         the ones at issue here.

26   31.   Although Congress has mandated that FDIC promulgate rules governing the insurance of

27         deposit accounts, it has not spoken clearly on the insurance to be provided for revocable

28         trust accounts.   Indeed, it appears that the relevant statutory provisions were enacted

1    before revocable trust accounts became popular in the late 1980s and early 1990s.  See 69

2    Fed. Reg. 2825 (Jan. 21, 2004).  Thus, "Congress could not have spoken clearly to this

3    issue . . . when the statute was enacted."  *Satterfield*, 569 F.3d at 954.  For all of these

4    reasons, the court concludes that the statute is silent as to the rules governing insurance of

5    revocable trust accounts.

6    32.   "'When a statute is ambiguous or leaves key terms undefined, a court must defer to the

7    federal agency's interpretation of the statute, so long as such interpretation is reasonable.'"

8    *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1056 (9th Cir. 2008) (citing *Metrophones

9    Telecommunications, Inc. v. Global Crossing Telecommunications, Inc.*, 423 F.3d 1056,

10   1067 (9th Cir. 2005)).  Because the FDIA "is silent to the issue at hand, we must defer to

11   the agency so long as the agency's interpretation 'is based on a permissible construction

12   of the statute.'"  *Satterfield*, 569 F.3d at 954 (quoting *Chevron*, 467 U.S. at 843).  The

13   FDIC's interpretation is permissible unless "arbitrary, capricious, or manifestly contrary

14   to the statute."  *Chevron*, 467 U.S. at 844.

15   33.   The FDIC promulgated a regulation providing that a revocable trust account "shall be

16   insured up to $100,000 for the prospective interest of each of the owner's designated

17   beneficiaries."  63 Fed. Reg. 25752 (May 11, 1998).  See also 64 Fed. Reg.15654 (Apr.

18   1, 1999) ("[T]he $100,000 insurance limit is not applied on a 'per owner' basis.  Rather,

19   the $100,000 insurance limit is applied on a 'per beneficiary' basis to all [ ] accounts

20   owned by the same person at the same insured depository institution.  For instance, a

21   [revocable trust] account owned by one person would be insured up to $500,000 if the

22   account names five qualifying beneficiaries").  The "per beneficiary" insurance was

23   available only for "qualifying beneficiaries."  Originally, these were spouses, children, and

24   grandchildren.  In 1999, however, the FDIC added siblings and parents as qualifying

25   beneficiaries.  *Id.*[26]

---

[26]It appears the definition of a qualifying beneficiary and the provision of "per beneficiary"
insurance dates back at least to 1967.  32 Fed. Reg. 10408 (July 14, 1967).

34.   Where a revocable trust account is established by more than one depositor, and held for the benefit of others, some or all of whom are qualifying beneficiaries, "the respective interests of each owner (which shall be deemed equal unless otherwise stated in the insured depository institution's deposit account records) held for the benefit of each qualifying beneficiary [are] separately insured up to $100,000."   63 Fed. Reg. 25761 (May 11, 1998).   In other words, "[t]he amount contributed by each grantor for each 'qualifying beneficiary' [is] insured separately."   Advisory Opinion FDIC-05-05 at *1.

35.   When a beneficiary of an account is not a qualifying beneficiary, the funds held for that beneficiary are treated as individually owned by each of the grantors, and are aggregated with other accounts owned by the grantors at the institution.   Each grantor is insured for all accounts he or she owns up to $100,000.   63 Fed. Reg. 25760 (May 11, 1998).

36.   The FDIC recognized that "the rules governing the insurance of [revocable] trust accounts are complex and confusing."   69 Fed. Reg. 2826 (Jan. 21, 2004).   "Consequently, in response to questions about coverage of [revocable] trust accounts, the FDIC . . . advise[d] depositors and bankers that they should assume that such accounts will be insured for no more than $100,000 per grantor, assuming the grantor has no single-ownership funds in the same depository institution. Otherwise, the FDIC suggest[ed] that the owners of living trust accounts seek advice from the attorney who prepared the trust document.   Depositors who contact[ed] the FDIC about their living trust insurance coverage [were] often troubled to learn that they [could not] definitively determine the amount of their coverage without a legal analysis of their trust document."   Id.   To ameliorate this confusion, in 2005 the FDIC issued an advisory opinion that explained in detail how a revocable trust with two grantors and multiple qualifying and non-qualifying beneficiaries would be treated.   Advisory Opinion FDIC-05-05. While application of the regulation is complex, plaintiffs cite no authority for the proposition that complexity alone compels a finding that a regulation is an arbitrary or capricious interpretation of the governing statute.   Moreover, the FDIC has endeavored to prevent unfair surprise by recommending that depositors seek legal advice and assume that beneficiaries are not insured, 69 Fed. Reg. 2826 (Jan. 21,

1   2004), and by providing a detailed explanation of the insurance treatment of revocable trust

2   accounts with accompanying examples, Advisory Opinion FDIC-05-05.

3   37.   The FDIC's regulation is consistent with the purpose of the statute – to insure the deposits

4   of all insured depository institutions, 12 U.S.C. § 1821(a)(1)(A), while simultaneously

5   setting limits on such insurance by establishing a maximum deposit insurance amount, 12

6   U.S.C. § 1821(a)(1)(B), and requiring the aggregation of deposits maintained by a

7   depositor at a single institution, 12 U.S.C. § 1821(a)(1)(C).  There is no evidence that the

8   FDIC's interpretation was "arbitrary, capricious, or manifestly contrary to the statute."

9   Consequently, the court concludes it is entitled to deference.

10   **C.   The New Regulation**

11   38.   On September 30, 2008, the FDIC promulgated a new interim rule that eliminated the

12   concept of qualifying beneficiaries.  It noted that "depositors, consumer groups and

13   bankers have questioned the fairness of limiting the coverage on revocable trust accounts

14   to the naming of certain beneficiaries," 73 Fed. Reg. 56708 (Sept. 30, 2008), and that

15   eliminating the concept of qualifying beneficiaries would make "the coverage rules easier

16   to understand.  Depositors and bankers no longer need to know who is a qualifying

17   beneficiary and who is not. . . . Thus, under the interim rule, the FDIC anticipates being

18   able to make quicker deposit insurance determinations on revocable trust accounts at

19   institution failures." *Id.*

20   39.   Under the interim rule, a revocable trust account with an aggregate balance exceeding

21   $500,000 and naming more than five beneficiaries is insured for the greater of $500,000,

22   or the "aggregate amount of the ownership interests of each different beneficiary named

23   in the trusts." 12 C.F.R. § 330.10(e) (interim rule), 73 Fed. Reg. 56711 (Sept. 30, 2008).

24   Because plaintiffs' trust had eight beneficiaries, it would be entitled to insurance of

25   $800,000, an amount exceeding the actual deposits.

26   40.   The interim rule is "effective as of September 26, 2008 for all existing and future

27   revocable trust accounts." 12 C.F.R. § 330.10(i) (interim rule), 73 Fed. Reg. 56712

28   (Sept. 30, 2008).  See also 73 Fed. Reg. 56710 (Sept. 30, 2008) ("The interim rule is

effective on September 26, 2008, the date on which the FDIC Board of Directors approved the interim rule").

**D.     Whether Plaintiffs' Account Was "Existing" on September 26, 2008**

41.    Plaintiffs argue that their "accounts undeniably existed when the [interim rule] was implemented."[27]  As evidence of this, they present a letter dated November 4, 2008, in which the FDIC advised plaintiffs that "additional documentation is needed regarding your formal and/or informal trust accounts."  The letter requested plaintiffs' cooperation in "finalizing [the] account determination."[28]

42.    While the FDIC's letter provides some evidence as to whether the agency's insurance determination was final, it provides no evidence as to whether the account itself was in existence.  The statement that additional documentation is needed regarding plaintiffs' trust accounts does not indicate whether the accounts are "past" or "existing."

43.    The court requested that the parties submit supplemental briefs addressing whether the trust accounts were "existing" as of September 26, 2008.  In response, plaintiffs proffered several documents in which the FDIC referred to or treated the accounts as in existence on that date.[29]  A July 11, 2008 press release regarding IndyMac's closure announced that all of the bank's assets would be transferred to IndyMac Federal Bank, an institution the FDIC would operate.[30]  The press release assured IndyMac depositors that they would automatically become customers of the new federal bank, and would "continue to have uninterrupted customer service and access to their funds."[31]  On July 23, 2008, IndyMac

---

[27]Pls.' Response at 3.

[28]*Id.*, Exh. A.

[29]Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Living Trust's Supplemental Brief ("Henrys' Supp. Brief"), Docket No. 32 (Sept. 22, 2009).

[30]*Id.* at 2.

[31]*Id.* at 3.

Federal Bank sent plaintiffs a letter stating that IndyMac Federal Bank would not change the "terms and conditions on any of [plaintiffs'] existing accounts."[32]   The FDIC contends that the trust accounts at IndyMac Federal Bank are not the same accounts that plaintiffs held at IndyMac.[33]   It asserts that deposit accounts are insured only through a particular insured depository institution, and that, when an account is transferred to a new bank, it is not considered the same account.   See 12 U.S.C. § 1821(a)(1)(A) ("The [FDIC] shall insure the deposits of all insured depository institutions as provided in this chapter").

44.   The FDIC asserts that it implements the statutory requirement that insurance determinations and payments occur "as soon as possible," 12 U.S.C. § 1821(f)(1), by fixing a depositor's rights "as of the day of failure," 73 Fed. Reg. 2364 (Jan. 14, 2008). The rule the FDIC cites, although proposed prior to IndyMac's closure, was not adopted until six days after IndyMac's failure.  73 Fed. Reg. 41170 (July 17, 2008).  The FDIC thus concedes, as it must, that the rule was not in effect as of July 11, 2008.  It contends, however, that the rule embodies "the FDIC's long-standing practice of determining a depositor's insurance as of the date of closure."[34]   Moreover, although not final as of September 26, 2008, the rule was drafted prior to that date, and provides some insight regarding the agency's intent with respect to the treatment of existing accounts.

45.   The FDIC also cites *Lambert v. Federal Deposit Insurance Corp.*, 847 F.2d 604 (9th Cir. 1988), in support of its position.  Although not directly on point, *Lambert* describes the date on which a bank closes as the "critical date" for purposes of the FDIC's insurance determination.  *Lambert* examined whether a trust was revocable or irrevocable, a question which turned on which the "surviving trustor" had died as of the date of the insurance

---

[32]Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Living Trust's Supplemental Evidentiary Submission, Docket No. 33 (Sept. 24, 2009) at 2.

[33]Defendant Federal Deposit Insurance Corporation's Supplemental Trial Brief ("FDIC's Supp. Brief"), Docket No. 31 (Sept. 22, 2009) at 2.

[34]*Id.* at 4 n. 2.

determination.  *Id.* at 607.  *Lambert*, therefore, addressed the critical date for purposes of factual determinations relevant to the amount of insurance available.  Here, the issue is somewhat different, i.e., what date is critical for purposes of determining the applicable *law*.  The remaining cases cited by the FDIC similarly concern factual determinations rather than the applicability of a change in the law.  *Villafane-Neriz*, 75 F.3d at 730 (holding that the FDIC may rely on erroneous bank records to determine whether there was an insured deposit "at the time of [the bank's] failure"); *Federal Deposit Insurance Corp. v. Liberty National Bank & Trust Co.*, 806 F.2d 961, 964-65 (10th Cir. 1986) (holding that "no additional rights can be created after insolvency," but that beneficiary's claims under standby letters of credit were provable against the FDIC as receiver despite the fact that the beneficiaries made their demand after the bank's insolvency because the claims were fixed as of the date of insolvency); *Federal Deposit Insurance Corp. v. McKnight*, 769 F.2d 658, 661 (10th Cir. 1985) (reviewing whether the FDIC had mistakenly paid funds on a cashier's check, and holding that a bank's closure "not only triggered the liquidation process, but it also cast in stone the relationship of defendants to the bank"); *American National Bank of Jacksonville v. Federal Deposit Insurance Corp.*, 710 F.2d 1528, 1540 (11th Cir. 1983) (holding that a plaintiff cannot rely on factual events that take place subsequent to a bank's closure to support its claimed ownership of escrow funds).  Plaintiffs' case authority similarly addresses the critical date for factual determinations relevant to the insurance determination.

46.   The FDIC also argues that its interpretation of the regulation is entitled to deference. "When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.'"  *Oregon Paralyzed Veterans of America*, 339 F.3d at 1131 (quoting *Martin*, 499 U.S. at 150-51).  See also *Wards Cove*, 307 F.3d at 1218 ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation").  The court concludes that

the FDIC's interpretation of the meaning of existing account as tied to a particular depository institution is reasonable, particularly in light of the statutory mandate that the FDIC insure the "deposits *of all depository institutions*." 12 U.S.C. § 1821(a)(1)(A) (emphasis added). The court is mindful that the FDIC articulated this rationale only in a legal brief at a late stage of this litigation. Because plaintiffs adduce no evidence that the term "existing account" has been applied inconsistently in other cases, because the interpretation is consistent with the FDIC's practice of determining insurance coverage as of the date of a bank's closure, and because the interpretation is a reasonable construction of the interim rule, the court affords the FDIC's interpretation deference and finds that plaintiffs' trust accounts at IndyMac were not "existing" on September 26, 2008, as that term is used in the interim rule. See *Long Island Care at Home*, 551 U.S. at 171 (where an agency's "interpretation of its own regulation reflects its considered views," even if those views were developed in response to litigation and set forth in a legal brief, the court should accept its interpretation so long as it is not "merely a *post hoc* rationalization").

### E.     Whether the Court Must Apply the Interim Rule Under *Bradley*

47.   That the FDIC correctly applied the old regulation does not end the inquiry, however. Plaintiffs argue that, notwithstanding the FDIC's regulatory interpretation, the rule in *Bradley v. School Board of City of Richmond*, 416 U.S. 696 (1974), mandates that "a court . . . apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711. See also *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281 (1969) ("[A]n appellate court must apply the law in effect at the time it renders the decision"); *DeGurules v. I.N.S.*, 833 F.2d 861, 863 (9th Cir. 1987) ("[I]n great national concerns . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside," quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801) (omission original)). *Bradley* emphasized that "even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to

1    be given recognition and effect." *Bradley*, 416 U.S. at 715.[35]

2    48.   Retroactive application of a rule is disfavored. *Bowen v. Georgetown University Hospital*,

3    488 U.S. 204, 208-09 (1988) ("Thus, congressional enactments and administrative rules

4    will not be construed to have retroactive effect unless their language requires this result").

5    "Fairness concerns dictate that courts must not lightly disrupt settled expectations or alter

6    the legal consequences of past actions." *Covey v. Hollydale Mobilehome Estates*, 116 F.3d

7    830, 835 (9th Cir. 1997).   The Supreme Court in *Bowen* did not cite *Bradley* and hence

8    created an "'apparent tension' between 'the rule articulated in *Bradley*' and the 'generally

9    accepted axiom' reaffirmed in *Bowen*." *Gersman v. Group Health Association, Inc.*, 975

10   F.2d 886, 894-95 (D.C. Cir. 1992) (quoting *Kaiser Aluminum & Chemical Corp. v.*

---

[35]Following oral argument, plaintiffs filed a notice of supplemental authorities, citing four cases in which the FDIC had taken the position that *Bradley* applied rather than *Bowen*. (Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Living Trust's Supplemental Authorities, Docket No. 36 (Oct. 20, 2009) (citing *F.D.I.C. v. Faulkner*, 991 F.2d 262, 265-66 (5th Cir. 1993) (" FDIC/Receiver contends that we should apply the apparently conflicting rule set down in *Bradley*"); *Federal Deposit Insurance Corp. v. Yemelos*, 778 F.Supp. 329, 331 (E.D. La. 1991) ("The FDIC argues that under *Bradley*[ ], laws are to be applied retroactively unless there is a clear Congressional intent to the contrary or if 'manifest injustice' would result"); *Federal Deposit Insurance Corp. v. Sullivan*, 744 F.Supp. 239, 241 (D. Colo. 1990) ("The FDIC, also citing *Bradley*, urges that FIRREA's amendment to § 1823(e) be applied retroactively"); *Federal Deposit Insurance Corp. v. Dalba*, No. 89-C-712-S, 1990 WL 43750, *3 (W.D. Wis. Feb. 27, 1990) ("[FDIC] asserts that the Court must always apply current law to actions pending before it").) The FDIC responded with a detailed memorandum distinguishing each case from the present one. (Defendant Federal Deposit Insurance Corporation's Response to Plaintiffs' Supplemental Authorities, Docket No. 37 (Oct. 29, 2009).) Specifically, *Faulkner* involved a request for injunctive relief, and thus fit within *Landgraf*'s exception for prospective relief. *Faulkner*, 991 F.2d at 267. In *Yemelos*, the court found clear congressional intent that the Comprehensive Crime Control Act of 1990 be applied retroactively. *Yemelos*, 778 F.Supp. at 332. While the holdings in *Dalba* and *Sullivan*, where the courts retroactively applied a legal defense under 12 U.S.C. § 1823(e) may at first blush appear in consistent with the FDIC's position in this action, they prove only that prior to the Supreme Court's decision in *Landgraf*, courts and the FDIC struggled to harmonize *Bradley* and *Bowen*. Plaintiffs' supplemental authorities do not demonstrate that the FDIC has ever taken a position inconsistent with that it advances here regarding the proper interpretation of *Landgraf*.

20

1    *Bonjorno*, 494 U.S. 827, 837 (1990)).[36]

2    49.    The Supreme Court reconciled *Bradley* and *Bowen* in *Landgraf v. USI Film Products*, 511

3           U.S. 244 (1994).  The *Landgraf* Court affirmed the rule in *Bowen* that "congressional

4           enactments and administrative rules will not be construed to have retroactive effect unless

5           their language requires this result." *Id.* at 272 (quoting *Bowen*, 488 U.S. at 208).  The

6           Court noted, however, the difficulty in determining whether a statute or rule is retroactive.

7           It observed that it was necessary to "ask whether the new provision attaches new legal

8           consequences to events completed before its enactment.  The conclusion that a particular

9           rule operates 'retroactively' comes at the end of a process of judgment concerning the

10          nature and extent of the change in the law and the degree of connection between the

11          operation of the new rule and a relevant past event." *Id.* at 269-70.[37]

12   50.    Affirming *Bowen*'s presumption against retroactivity, the Court interpreted *Bradley* as an

13          exception to the general rule.  The congressional enactment applied in *Bradley* was a

14          provision governing awards of attorneys' fees in civil rights cases.  Prior to its passage,

15          federal courts were permitted to award fees based on equitable principles, as the district

16          court in *Bradley* had done.  "In light of the prior availability of a fee award, and the

17          likelihood that fees would be assessed under pre-existing theories, [the Court] concluded

18   _____

19   [36]In *Kaiser*, the Supreme Court expressly declined to reconcile the two lines of precedent
20   because it concluded that Congress clearly intended that a statutory amendment was to apply
     prospectively only.  *Kaiser*, 494 U.S. at 837.  Justice Scalia, concurring in the result, wrote
21   separately to state that the *Bradley* and *Bowen* were not merely in apparent tension, but in
     "irreconcilable contradiction." *Id.* at 841 (Scalia, J., concurring).  He reviewed the *Thorpe* and
22   *Bradley* cases and determined that they had misinterpreted and misapplied Supreme Court
     precedent, including Chief Justice Marshall's opinion in *Schooner Peggy*.  Justice Scalia noted that
23   *Schooner Peggy* stood only for the proposition that when Congress "plainly says" legislation has
     retroactive effect, the courts may depart from "the ordinary presumption which courts will
24   'struggle hard' to apply" against retroactivity.  *Id.* at 846-47.

25   [37]The Court explicitly noted that this test would "leave room for disagreement in hard
26   cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical
     clarity." *Landgraf*, 511 U.S. at 270.  Nonetheless, it observed that "retroactivity is a matter on
27   which judges tend to have 'sound . . . instinct[s].'" *Id.* (quoting *Danforth v. Groton Water Co.*,
28   178 Mass. 472, 476 (1901) (Holmes, J.)).

1    that the new fee statute simply 'd[id] not impose an additional or unforeseeable obligation'

2    on the school board." *Landgraf*, 511 U.S. at 278 (quoting *Bradley*, 416 U.S. at 721).

3    51.   In *Landgraf*, the Supreme Court identified three exceptions to the presumption against

4    retroactivity.  It first cited *Thorpe*, which held that a new agency policy requiring a local

5    housing authority to give notice and an opportunity to respond before evicting a tenant

6    applied to an eviction proceeding commenced before it was enacted.  *Thorpe*, 393 U.S.

7    268 at 279.  The *Landgraf* Court characterized *Thorpe* as a case in which the "new hearing

8    procedures did not affect either party's obligations," and held that "procedural rules may

9    often be applied in suits arising before their enactment without raising concerns about

10   retroactivity." *Landgraf*, 511 U.S. at 275-76.

11   52.   In addition to procedural rules, the Court also concluded cases seeking "prospective-relief"

12   were not subject to the presumption against retroactivity.  "When the intervening statute

13   authorizes or affects the propriety of prospective relief, application of the new provision

14   is not retroactive." *Id.* at 273.  The Court cited *American Steel Foundries v. Tri-City*

15   *Central Trades Council*, 257 U.S. 184 (1921), as an example of this principle.  *Id.*  There,

16   the Court held that a section of the Clayton Act, enacted while the case was pending on

17   appeal, governed the propriety of injunctive relief against labor picketing.  *Id.* at 201;

18   *Landgraf*, 511 U.S. at 273.  "[B]ecause relief by injunction operates *in futuro* and the right

19   to it must be determined as of the time of the hearing, [the amendment] relating to

20   injunctions was controlling in so far that decrees entered after its passage should conform

21   to its provisions." *American Steel Foundries*, 257 U.S. at 201.

22   53.   Finally, the Court created an exception for statutes "conferring or ousting jurisdiction,

23   whether or not jurisdiction lay when the underlying conduct occurred or when the suit was

24   filed." *Landgraf*, 511 U.S. at 274 (citing *Bruner v. United States*, 343 U.S. 112, 116-17

25   (1952)).  The Court concluded such an exception was appropriate because "[a]pplication

26   of a new jurisdictional rule usually 'takes away no substantive right but simply changes the

27   tribunal that is to hear the case.'" *Id.* (quoting *Hallowell v. Commons*, 239 U.S. 506, 508

28   (1916)).

54.   The *Landgraf* Court summarized its holding as follows:

> "When a case implicates a federal statute enacted after the events in
> suit, the court's first task is to determine whether Congress has
> expressly prescribed the statute's proper reach.  If Congress has done
> so, of course, there is no need to resort to judicial default rules.
> When, however, the statute contains no such express command, the
> court must determine whether the new statute would have retroactive
> effect, i.e., whether it would impair rights a party possessed when
> he acted, increase a party's liability for past conduct, or impose new
> duties with respect to transactions already completed.  If the statute
> would operate retroactively, our traditional presumption teaches that
> it does not govern absent clear congressional intent favoring such a
> result."  *Id.* at 280.

55.   The Ninth Circuit applied *Landgraf* to administrative regulations in *Covey*.  *Covey*
concerned the applicability of Department of Housing and Urban Development ("HUD")
regulations that defined "housing for older persons" that was exempt from the Fair
Housing Act's prohibition on familial status discrimination.  *Covey*, 116 F.3d at 832-33.
Under a rule promulgated in 1988, the exemption applied if a party adduced evidence of
"the existence of significant facilities and services specifically designed to meet the
physical or social needs of older persons."  *Id.* at 832.  Because "significant facilities and
services" proved difficult to interpret and implement, HUD promulgated more specific
guidelines in 1995.  *Id.* at 833.  Shortly after their implementation, a district court applied
the 1995 regulations and granted summary judgment for defendants in a case that had been
filed in 1993.  *Id.* at 834.  Plaintiffs did not seek prospective relief and all the events at
issue had occurred prior to the effective date of the 1995 HUD regulations.  *Id.* at 835.

56.   The Ninth Circuit held that "applying the 1995 regulations retroactively simply because
[plaintiffs'] claim ha[d] not yet been reduced to a judicial determination of liability would
gravely undermine the presumption against retroactivity."  *Id.* at 837.  Citing *Bradley*,

1    defendants argued that the new regulations simply clarified HUD's prior definition of the

2    "significant facilities and services" requirement. *Id.* The Ninth Circuit concluded, to the

3    contrary, that the new regulations "substantially alter[ed] the standard" for determining

4    whether a facility could gain an exemption and declined to apply it to the dispute at hand.

5    *Id.*[38]

6  57.  Applying *Landgraf* and its Ninth Circuit progeny to the interim rule at issue in this case,

7    the court must "first determine whether the [FDIC] expressly stated its intent to apply the

8    new [rule] retroactively or prospectively." *TwoRivers v. Lewis*, 174 F.3d 987, 993 (9th

9    Cir. 1999) (citing *Landgraf*, 511 U.S. at 280). The court has concluded, as a matter of

10   deference to the administrative agency that promulgated the regulation, that the FDIC did

11   not expressly state its intent to apply the statute to accounts held at depository institutions

12   that closed prior to September 26, 2008.

13 58.  Given that there is no "clear language directing that [the court] apply the new statute

14   retroactively, the court next [examines] whether the new statute would have retroactive

15   effect." *Id.* (citing *Landgraf*, 511 U.S. at 280). *Landgraf* identifies three factors that

16   inform the court's decision in this regard: whether the regulation "would impair rights a

17   party possessed when he acted, increase a party's liability for past conduct, or impose new

18   duties with respect to transactions already completed." *Covey*, 116 F.3d at 835 (quoting

19   *Landgraf*, 511 U.S. at 280). See also *Landgraf*, 511 U.S. at 269 ("'[E]very statute, which

20   takes away or impairs vested rights acquired under existing laws, or creates a new

21   obligation, imposes a new duty, or attaches a new disability, in respect to transactions or

22   considerations already past, must be deemed retrospective,'" quoting *Society for*

23   *Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (C.C.N.H. 1814)

24

25     [38]The Ninth Circuit reached the same conclusion in *In re NOS Communications*, 495 F.3d

26   1052 (9th Cir. 2007). There, plaintiffs had not been billed by defendant after Truth-in-Billing regulations were promulgated. The court concluded that they could not assert claims under the

27   regulations, stating: "Nothing in the language indicates a clear congressional intent favoring retroactivity. In addition, the regulation imposes new duties with respect to transactions already

28   completed." *Id.* at 1062.

1    (Story, J.)); *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 947 (1997)

2    (describing each factor outlined in *Landgraf* and *Wheeler* as "a *sufficient*, rather than a

3    *necessary*, condition for invoking the presumption against retroactivity" (emphasis

4    original)).

5    59.   Application of the new regulation to this case would unquestionably have retroactive effect.

6          It would increase the FDIC's liability for past conduct, as the FDIC would be required to

7          make a higher insurance payment based on a July 11, 2008 bank failure due to regulations

8          promulgated on September 26, 2008.  Because it "attaches a new disability," namely, a

9          significantly increased level of insurance "in respect to transactions or considerations

10         already past [it] must be deemed retrospective." *Wheeler*, 22 F. Cas. 767.  See also

11         *Covey*, 116 F.3d at 835 ("Cases involving settled contract and property rights, for

12         example, require predictability and stability and are generally inappropriate candidates for

13         retroactivity").[39]

14   60.   "[I]f the court determines that the [regulation] operates retroactively, the traditional

15         presumption in favor of prospectivity precludes application of the new [regulation] 'absent

16         clear congressional [or regulatory] intent favoring such a result.'" *TwoRivers*, 174 F.3d

17         at 993 (quoting *Landgraf*, 511 U.S. at 280).  As in *Covey*, the court finds that the new

18         regulations "substantially alter the standard" for determining the insurance coverage or

19         revocable trust accounts.  *Covey*, 116 F.3d at 837.  Applying the new regulation simply

20         because plaintiffs' claim "has not yet been reduced to a judicial determination . . . would

---

22   [39]At oral argument, plaintiffs cited the *DeGurules* factors that govern whether retroactive
     application will cause manifest injustice.  *DeGurules*, 833 F.2d at 863 ("Whether a retroactive
23   application will cause manifest injustice is . . . turn determined by an assessment of three factors:
     (1) the nature and identity of the parties; (2) the nature of their rights; and (3) the nature of the
24   impact of the change in law upon those rights").  The *DeGurules* court held that "[t]he fact that
     the party adversely affected by the new law is a governmental entity makes a finding of manifest
25   injustice less likely." *Id.* (quoting *Campbell v. United States*, 809 F.2d 563, 575 (9th Cir. 1987)).
     Without deciding the continued vitality of *DeGurules* in light of the Supreme Court's later ruling
26   in *Landgraf*, the court need not address whether retroactive application would cause manifest
     injustice, because the court has already found that the regulation does not have retroactive
27   application.

gravely undermine the presumption against retroactivity," particularly given the lack of a clear regulatory intent to the contrary.[40]

**F.    Whether FDIC's Application of the Prior Regulation Violates Due Process**

61.    In their reply, plaintiffs argue that the FDIC's action violates the Due Process Clause of the Fifth Amendment.  Specifically, they assert that the prior regulation was so ambiguous and complex that it resulted in "multiple, conflicting interpretations by the public and FDIC trained bank employees."[41]  Plaintiffs' support for this proposition is *Brandt v. Hinkel*, 427 F.2d 53 (9th Cir. 1970).

---

[40]At oral argument, plaintiffs argued that three policies articulated in *Landgraf* militate in favor of applying the new regulation retroactively.  First, plaintiffs cited *Landgraf*'s invocation of elementary considerations of fairness.  *Landgraf*, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted").  The Supreme Court concluded, however, that considerations of fairness justify a presumption *against* retroactivity, and not, as plaintiffs suggest, that they favor retroactive application.  See also *Hernandez de Anderson v. Gonzales*, 497 F.3d 927, 935 (9th Cir. 2007) (noting that *Landgraf*'s invocation of "elementary considerations of fairness" justified a finding that "the legal effect of conduct should ordinarily be assessed under the law that existed when the *conduct* took place," and not according to the law that exists at the time the court reviews the conduct, quoting *Landgraf*, 511 U.S. at 264-65); *Koch v. S.E.C.*, 177 F.3d 784, 785 (9th Cir. 1999) ("elementary considerations of fairness" require a "clear statement" that legislation is to be applied retroactively).

Second, plaintiffs contended that there are many situations in which it is proper to apply new statutes or regulations enacted after the events that give rise to the cause of action.  As discussed, *Landgraf* found retroactive application proper in three situations, none of which describes the circumstances in which plaintiffs find themselves.

Finally, plaintiffs asserted that retroactivity provisions "often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary."  *Landgraf*, 511 U.S. at 267-68.  This is unquestionably true.  Nonetheless, the next sentence of the *Landgraf* opinion states: "However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness."  *Id.* at 268.  Because the court concludes that the FDIC did not indicate an intention that the new regulation apply retroactively, this policy does not aid plaintiffs here.

[41]*Id.* at 5.

26

62.   In *Brandt*, appellants, having been denied an application for an oil and gas lease, were advised by the Bureau of Land Management ("BLM") that they could either substitute their forms and reapply or appeal the decision. *Id.* at 55. After appellants reapplied, however, the Secretary of the Interior concluded: (1) that the amended application was an attempt to create a new offer, and so it was junior to offers that had been received before the second application; and (2) that by failing to appeal the initial determination, appellants had lost the right to assert the validity of the original offer. *Id.*

63.   The Ninth Circuit held that the notice provided by the BLM did not satisfy due process because it failed to advise appellants that reapplying would have an adverse effect on the priority of their application, and because it was ambiguous as to whether it was a final decision. *Id.* at 56-57. The BLM's initial determination stated that "the subject offer is hereby held for rejection" and that "failure to submit a new offer form will result in the final rejection and closing of the case without further notice." *Id.* at 57. The Ninth Circuit concluded that these statements were subject to different interpretations and held that "due process [was] not satisfied by a decision which is subject to several constructions of an element of finality." *Id.*

64.   It held that due process is violated when an agency gives "erroneous advice" that is "so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement." *Id.* at 56. See also *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60-61 & n. 13 (1984) ("Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government," citing *Brandt*, 427 F.3d at 57); *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir. 1973) ("[E]stoppel is available as a defense against the government if

1    the government's wrongful conduct threatens to work a serious injustice and if the public's

2    interest would not be unduly damaged by the imposition of estoppel").

3    65.   Plaintiffs' reliance on *Brandt* fails.  *Brandt* was premised on a "misstatement" by agency

4          officials that rendered the notice provided to plaintiffs insufficient.  Plaintiffs do not

5          identify any misstatement in the Notice of Allowance of Claim that they received from the

6          FDIC.  Although that notice does not explicitly state that it is a final agency action, it

7          advises that if plaintiffs "have uninsured deposits, as established by the FDIC's Insurance

8          determination, [plaintiffs] automatically have a claim for such a fund."  It also notes that,

9          "[i]n the event [plaintiffs] disagree with the FDIC's determination with respect to [their]

10         uninsured deposits, [they] may seek review of the FDIC's determination" in district

11         court.[42]   The accompanying receivership certificate and oral explanation of the

12         determination memorialized in the Depositor Interview Form[43] satisfy the court that

13         plaintiffs received sufficient notice of the availability of a claim and the adverse effect of

14         the agency's determination.  It thus concludes that the FDIC's notice contained no

15         misstatement or erroneous advice.

16   66.   Plaintiffs do not contend that the regulation itself misstates or misrepresents the rule

17         applicable to insurance determinations for revocable trust accounts.  They merely assert

18         that it was hard to understand, and that members of the public and FDIC-trained bank

19         employees misconstrued it.  Similarly, they do not contend that the FDIC's effort to clarify

20         and provide examples of the operation of the rule in Advisory Opinion FDIC-05-05

21         misrepresented the manner in which it operated.  Consequently, the court concludes that

22         *Brandt* provides no basis for estopping the FDIC from asserting and applying the prior

23         regulation governing insurance for revocable trust accounts.[44]

---

25   [42]AR, Exh. D.

26   [43]*Id.*, Exhs. B, D.

27   [44]In citing *Brandt*, the Henrys do not appear to challenge the constitutionality of the
28   regulation itself.  Under the Due Process Clause, "[a] rational relationship to a legitimate

## III. CONCLUSION

For the reasons stated, the court finds that plaintiffs are not entitled to recover further insurance for their revocable trust accounts from the FDIC.

DATED: February 18, 2010

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

government interest will normally suffice to uphold [a] regulation." *Beller v. Middendorf*, 632 F.2d 788, 808 (9th Cir. 1980), cert. denied, 454 U.S. 855 (1981).  "In evaluating claims that a government action violates substantive due process, we do not sit as a super-legislature.  The mere fact that we might not adopt a regulation if we were the policymakers is insufficient to hold such regulation unconstitutional under the due process clause." *Snaman v. Thornburgh*, 956 F.2d 275 (Table), 1992 WL 33924, *2 (9th Cir. Feb. 25, 1992) (Unpub. Disp.).  Because the Henrys did not raise such a constitutional challenge, the FDIC has had no opportunity to argue whether the regulation has a rational relationship to a legitimate government interest.  It is clear, however, that insuring the deposits of depository institutions while simultaneously setting limits on such insurance by establishing a maximum deposit insurance amount constitutes a legitimate government interest.  Requiring the aggregation of deposits maintained by a depositor at a single institution, and limiting insurance for revocable trust accounts to certain categories of beneficiaries, appears to be rationally related to this interest.  See *id.* (holding that "the particular method" is not rationally related to legitimate government interest if it is "clearly arbitrary and unreasonable").